Lon R. Leavitt
HALUNEN LAW PLLC
Arizona Bar No. 035825
2155 West Pinnacle Peak Road, Suite 201
Phoenix, Arizona 85027
Telephone: (602) 535-2203
Fax: (612) 605-4099
leavitt@halunenlaw.com

Amy L. Easton*
PHILLIPS & COHEN LLP
D.C. Bar No. 463710
2000 Massachusetts Avenue NW
Washington, D.C. 20036
Telephone: (202) 833-4567
aeaston@phillipsandcohen.com

Jeffrey W. Dickstein*
PHILLIPS & COHEN LLP
Florida Bar No. 434829
2 South Biscayne Boulevard, Suite 1600
Miami, Florida 33131
Telephone: (305) 372-5200
jdickstein@phillipsandcohen.com

*Attorneys for Plaintiff/Relator*

FILED ___ LODGED
___ RECEIVED ___ COPY

MAY 11 2020

CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America *ex rel.* Tonya Cass,<br><br>Plaintiff-Relator,<br><br>v.<br><br>Atlantic Home Health Care, LLC; Haven Home Health Care, LLC; Atlantic Home Health Care, LLC d/b/a Haven Home Health Care, LLC; Kirk Tjalas; Jamin Ruark; and Kevin Ruark;<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729,** *et seq.*<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

1

Pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (the "FCA"), *qui tam* Plaintiff-Relator Tonya Cass ("Relator"), through her attorneys, brings this case on behalf of the United States of America, acting through its various agencies and departments ("the Government"), and on her own behalf. For her Complaint against Atlantic Home Health, LLC, Haven Home Health, LLC, Atlantic Home Health, LLC d/b/a Haven Home Health, LLC, Kirk Tjalas, Jamin Ruark, and Kevin Ruark (collectively "Haven" or "Defendants"), Relator alleges, based on personal knowledge, relevant documents, and related information and belief, as follows:

**I.    INTRODUCTION**

1.    Since at least 2017, Defendants have fraudulently billed tens of millions of dollars to a Congressionally-created government program for medical services that they did not and do not provide. This absence of medical care exploits and endangers the vulnerable patient population that this unique program was enacted to protect.

2.    During World War II and the Cold War, as the United States designed, built, and tested nuclear weapons, thousands of Americans were unknowingly exposed to unsafe radiation in the process. Radiation exposure afflicted workers who mined, processed, and transported uranium and workers who were involved in nuclear weapon construction and testing. Many of these workers were essential to the nation's defense.

3.    Radiation exposure also impacted residents who lived close to an area of, or downwind from, underground and atmospheric testing and those who consumed food or water contaminated by nuclear fallout.

4.    Radiation exposure resulted in cancers, birth defects, and many other illnesses and injuries. Some were immediately apparent, and others did not become symptomatic for years or decades.

5.    These workers and others had no warning of the risks they faced by virtue of where they worked or where they lived, and many of them and their children developed severe radiation-induced illnesses and conditions. Thus, Congress enacted the Radiation Exposure Compensation Act ("RECA") and other government programs,

2

including, and most relevant to this action, the Energy Employees Occupational Illness Compensation Program ("EEOICP").

6.      This program provides, among other benefits, medically necessary medical care and treatment for (radiation-related) covered conditions without any cost to the patient. One of the medical benefits it specifically includes—and the primary focus of this lawsuit—is medically necessary "home health care."

7.      Home health care, as the name implies, is health care delivered in the patient's home by a qualified, licensed physician, nurse, therapist, and/or aide, determined by the patient's diagnosis and condition and as prescribed by the treating physician. It may include feeding tube care, injections, intravenous care, catheter care, monitoring vital signs, monitoring serious illness and unstable health status, and routine observations and care. Receiving care at home often avoids hospitalizations and provides the patient with a safe, secure, familiar environment. For these reasons, it is expressly authorized under the EEOICP for approved radiation-related conditions when ordered and certified as medically necessary by a physician.

8.      Home health care cannot be rendered by telephone or computer. In fact, with very recent limited, temporary exceptions due to the Covid-19 pandemic, the EEOICP does not permit telehealth/telemedicine at all.

9.      Yet telephones are exactly how Defendants "performed" the majority of the home health care they "provided" to EEOICP patients, if they provided it at all. They failed to send qualified personnel to the patient's homes—often relying on, and paying kickbacks to, family members instead—and failed to render the care that these sick and vulnerable patients required. Worse, because the patients and the program relied on Defendants' assurances of care, they did not obtain needed care elsewhere.

10.     The absence of in-home nurses is more than a fraudulent billing problem—it is a medical problem. Some patients, detailed below, suffered physical harm and delayed medical treatment as a direct result of nurses not being on-site when they should have been.

11.     Where Defendants did not fail, however, was in billing the Government. The bills reflect that a nurse, home health aide, and/or other Haven medical provider were providing patients in-home care when they were not.

12.     This intentional, flagrant "phone it in" medical care, payment of kickbacks, and utilization of untrained and unlicensed family members resulted in patient neglect, patient harm, and huge, fraudulent profits to Defendants. Defendants "treated" approximately 90 EEOICP patients for which they billed, and were paid, at least $12 million by the federal government in 2019. Upon information and belief, Relator alleges the United States incurred additional losses in prior and subsequent years.

13.     Defendants, individually and by and through Haven and its related companies, engaged (and still engage) in the following fraudulent and egregious behavior, as described more fully below, resulting in causing and/or submitting false and fraudulent claims to the Government:

- Submitting claims for health care they did not render
- "Performing" **in-home** health care by telephone
- Paying kickbacks to patients' families in order to enroll or keep the patient with Haven
- Utilizing unqualified, untrained, unsupervised, and/or unlicensed people and/or family members for patient care
- Submitting claims for medical care even after patients left their care
- Falsifying medical records
- Causing the submission of claims for Haven EEOICP patients who elected hospice services through Medicare
- Submitting claims to the Government for "care" rendered to a non-EEOICP patient

14.     As a result of the conduct described in this Complaint, Defendants not only caused harm to patients, they also vastly overcharged the Government for medical services.

4

15.     This is an action to recover damages and civil penalties on behalf of the Government arising from materially false and/or fraudulent statements, records, and claims that Defendants and/or their agents and employees knowingly made and caused to be made in violation of the FCA.

## II.    PARTIES

16.     Relator Tonya Cass ("Relator") resides in the District of Arizona. Relator was employed by Haven Home Health and its predecessor, Victory Medical Solutions, from September 2017 through January 2020. Relator worked in Haven's Tucson, Arizona, location as the Corporate Administrator and Director of Human Resource Administration and Management.

17.     Relator repeatedly encountered Defendants' rampant fraudulent practices at Haven and complained about Haven's fraud to the individual Defendants (who were the perpetrators of the schemes) as well as to the Department of Labor ("DOL"), the government agency administering, in part, the EEOICP. At the individual Defendants' instructions, the corporate Defendants submitted fraudulent bills to the DOL. One basis for Relator's knowledge of this fact is that she entered the corporate Defendants' information in the DOL's payment portal, she was involved in some of the billing, and she saw actual bills and explanations of benefits reflecting payment from the DOL to those corporate entities. Relator has direct personal knowledge of the allegations in this Complaint.

18.     Defendants Atlantic Home Health, LLC, Haven Home Health, LLC, and Atlantic Home Health, LLC d/b/a Haven Home Health, LLC (collectively referred to as "Haven") provide home health and other health care services in Arizona and other states. Haven has offices in Arizona at 7620 North Hartman Lane, Suite 122, Tucson, Arizona 85743 and at 15551 North Greenway-Hayden Loop, Suite 155A, Scottsdale, Arizona 85260. Corporate Defendants Atlantic Home Health, LLC, and Haven Home Health, LLC, submitted fraudulent bills to the DOL. Haven is owned, operated, managed, and/or controlled by the individual Defendants Kirk Tjalas, Jamin Ruark, and Kevin Ruark.

19.     Defendant Kirk Tjalas is Haven's Clinical Director. Mr. Tjalas owns, operates, manages, and/or controls Haven. He has interests in other health care companies, including Act Now DME, Act Now Home Health Care, Arizona Hospice, Absolutely Haven, and Haven Staffing. Tjalas resides in Arizona. He is a registered nurse and became a nurse practitioner in 2019. Tjalas is in charge of clinical functions at Haven and approves and enforces all policies and procedures, trains staff, and makes most decisions for Haven's DOL Division. He has also been involved in the care of many of the DOL patients at issue in this Complaint and has been involved with and is aware of the fraudulent practices alleged herein regarding Haven. Unrelatedly, but significantly, in the mid-1990s Tjalas served more than three years in prison as a result of theft-related charges.

20.     Defendant Jamin Ruark owns, operates, manages, and/or controls Haven. He also has interests in other health care companies with Tjalas, including Arizona Hospice, Absolutely Haven, and Haven Staffing. Jamin Ruark provides administrative oversight for Haven's DOL Division and manages the other Haven divisions. He and his father, Kevin Ruark, are in charge of Haven's finances. Jamin Ruark has been involved in and is aware of the fraudulent practices alleged herein.

21.     Defendant Kevin Ruark is Jamin Ruark's father. Kevin Ruark owns, operates, manages, and/or controls Haven. He oversees financial-related meetings for all Haven divisions and holds weekly revenue and billing meetings. He is also on the Board of Directors. Kevin Ruark has been involved in and is aware of the fraudulent practices alleged herein.

## III.   JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

23.     Relator is aware of no subject matter or other jurisdictional bars set forth in the FCA that would be applicable to this action.

1   24.     There has been no statutorily relevant public disclosure of the "allegations

2   or transactions" in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4) (1986)

3   or as that section was amended in 2010. Moreover, even if such a disclosure had

4   occurred, Relator would qualify as an original source of the information in this Complaint

5   under either version of the statute. Before filing this action, Relator voluntarily disclosed

6   to the Government the information on which the allegations or transactions in this

7   Complaint are based. Additionally, Relator has direct and independent knowledge about

8   the misconduct alleged herein and that knowledge is independent of and materially adds

9   to any publicly disclosed allegations or transactions relevant to her claims.

10   25.     This Court has personal jurisdiction over the Defendants pursuant to 31

11   U.S.C. § 3732(a) because that section authorizes nationwide service of process, because

12   the Defendants have minimum contacts with the United States, and because the

13   Defendants transact substantial business in the District of Arizona.

14   26.     Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b),

15   28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) because one or more of the Defendants can

16   be found in, transact business in, or have transacted business in this district. At all times

17   relevant to this Complaint, one or more of the Defendants regularly conducted, and

18   continue to conduct, substantial business within this district, maintain employees and

19   offices in this district, and/or reside in this district.

20   **IV.   APPLICABLE LAW**

21   **A.     The False Claims Act**

22   27.     The FCA is "the Government's primary litigative tool" for combating

23   schemes to fleece the government. False Clams Amendment Act of 1986, S. Rep. No. 99-

24   345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274. It is broadly drafted to

25   reach beyond common law fraud.

26   28.     The FCA prohibits any person from knowingly making, or causing to be

27   made, a false or fraudulent claim for payment to the United States. 31 U.S.C.

28   § 3729(a)(1)(A).

7

29.     The FCA also prohibits knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

30.     In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States. 31 U.S.C. § 3729(a)(1)(G).

31.     Under the FCA, the term "claim" means any request or demand for money, whether under a contract or otherwise, presented to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(b)(2)(A)(i). A "claim" is also a request or demand for money made to a contractor or other recipient if (a) the money is to be spent or used on the Government's behalf or to advance a Government program or interest and (b) if the Government provides, has provided, or will reimburse such contractor or other recipient for any portion of the money requested or demanded. 31 U.S.C. § 3729(b)(2)(A)(ii).

32.     The FCA defines the term "obligation" to mean an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment. 31 U.S.C. § 3729(b)(3).

33.     A false or fraudulent claim under the FCA may take many forms, "the most common of which is a claim for payment for goods and services not provided or provided in violation of contract terms, specification, statute or regulation." S. Rep. No. 99-345, at 9 (1986).

34.     The misrepresentation must be material, which the FCA defines objectively, not subjectively, to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

35.     The FCA defines knowingly to include actual knowledge, reckless disregard, and deliberate ignorance. 31 U.S.C. § 3729(b)(1)(A). No specific intent to defraud need be shown. 31 U.S.C. § 3729(b)(1)(B).

**B.     The Radiation Exposure Compensation Act**

36.     The Radiation Exposure Compensation Act ("RECA"), 42 U.S.C. § 2210 note, is a statutory compensation scheme Congress enacted in 1990 to provide partial restitution to certain individuals who developed a variety of serious illnesses after exposure to radiation from atmospheric nuclear tests or underground uranium mining during the Cold War era. *See* Pub. L. No. 101–426, § 2, 104 Stat. 920 (1990) (codified as amended at 42 U.S.C. § 2210 note). RECA provides monetary benefits to, among others, individuals who developed a qualifying illness after working as uranium miners in specified states between January 1, 1942, and December 31, 1971, and either (1) were subjected to 40 working level months of radiation, or (2) worked in qualifying employment for at least 12 months. *See id.* § 5.

37.     RECA recognized that these individuals were "involuntarily subjected to increased risk of injury and disease to serve the national security interests of the United States." *Id.* § 2(a)(5). While eligible uranium-industry employees under RECA were originally limited to "individual[s] who [had been] employed in a uranium mine," *id.* § 5(a), Congress later expanded eligibility by amendment, *see* Pub. L. No. 106–245, § 3(c)(1)(a)(1)(A), 114 Stat. 501 (2000) (codified as amended at 42 U.S.C. § 2210 note).

**C.     Energy Employees Occupational Illness Compensation Program Act**

38.     The Energy Employees Occupational Illness Compensation Program Act ("EEOICPA"), enacted in October 2000, provides compensation and health care benefits for current and former employees of the Department of Energy ("DOE") and certain of its contractors and subcontractors who incurred illnesses as a result of exposure to radiation or other toxic substances at facilities covered under the statute. 42 U.S.C. § 7384d(b) (establishing a compensation program for "covered employees" and "survivors of such employees" for "illnesses incurred . . . in the performance of duty for the Department of Energy and certain of its contractors and subcontractors").

39.     Part B of the EEOICPA, effective on July 31, 2001, compensates current or former employees (or their survivors) of the DOE, its predecessor agencies, and certain

of its vendors, contractors and subcontractors, who were diagnosed with a radiogenic cancer, chronic beryllium disease, beryllium sensitivity, or chronic silicosis, as a result of exposure to radiation, beryllium, or silica while employed at covered facilities. The EEOICPA also provides compensation to individuals (or their eligible survivors) awarded benefits by the Department of Justice ("DOJ") under Section 5 of RECA.

40.     Part E of the EEOICPA (enacted October 28, 2004) compensates DOE contractor and subcontractor employees, eligible survivors of such employees, and uranium miners, millers, and ore transporters as defined by RECA Section 5, for any occupational illnesses that are causally linked to toxic exposures in the DOE or mining work environment.

41.     Implementation of the EEOICPA has been delegated to the DOL's Director of the Office of Workers' Compensation Programs ("OWCP") but involves the coordinated efforts of four federal agencies: the DOL, the DOE, the DOJ, and the Department of Health and Human Services ("HHS"). 20 C.F.R. § 30.2(a) and (b).

42.     In addition to compensation, eligible individuals receive health care benefits, including home-health services from designated providers that are submitted to OWCP and reimbursed by the DOL. *See* 42 U.S.C. §§ 7384e, 7384t; 20 C.F.R. §§ 30.400, 30.403.

43.     Specifically, the "OWCP will authorize and pay for home health care" under the EEOICPA if "the care has been determined to be medically necessary." 20 C.F.R. § 30.403(a). The OWCP "will pay for approved periods of care by a registered nurse, licensed practical nurse, home health aide or similarly trained individual, subject to [certain] pre-authorization requirements . . ." *Id*. To file an initial claim for home health care, "the beneficiary must submit Form EE-17A to OWCP and identify his or her treating physician." 20 C.F.R. § 30.403(c).

44.     The "OWCP then provides the treating physician with Form EE-17B, which asks the physician to submit a letter of medical necessity and verify that a timely face-to-face physical examination of the beneficiary took place." *Id*. The letter of medical

necessity must specify the level of care required and the appropriate type of health care professional who will attend to the patient (i.e., Registered Nurse ("RN"), Licensed Practical Nurse ("LPN"), Personal Care Attendant ("PCA"), Certified Nursing Assistant ("CAN"), or Home Health Aide ("HHA")).

45.     Charges for home health services must be supported by appropriate medical evidence and must be submitted utilizing the appropriate form. 20 C.F.R. §§ 30.700, 30.701.

46.     EEOICP Procedural Manual Version 2.0 , effective December 2017, was applicable during the time period of Haven's scheme and explains that home health care "includes both in-home skilled nursing care, and the services of a home health aide [HHA] to assist [the patient] with activities of daily living, related to [the patient's] accepted condition(s)." *Id*., Appendix 1, Exhibit 26-2, p. 7. "[S]ervices are authorized based upon the presentation of medical evidence from [the patient's] treating physician confirming the need for care due to an accepted illness." *Id*.

47.     Once approval is granted for home health care, the patient is free to choose from any licensed medical provider of the services the patient requires, as long as the provider is enrolled with the Division of Energy Employees Occupational Illness Compensation ("DEEOIC"). *Id.*

48.     Home health services, by definition, must be rendered in the patient's home. EEOICP coverage of home health services requires that the patient's treating physician submit a signed letter of medical necessity certifying and explaining, among other things, the need for home health services and distinguishing "between the patient's medical need for skilled nursing care, personal attendant care, and/or any other type of care, **while in the home**." *Id.,* Chapter 30, Section 1(g)(1) (emphasis added). The Manual reiterates this "in-home" requirement for home health services many times. *See id.*

49.     Submitting claims for home health services require the following representations:

1

2

3

4

5

6

7

8

9

10

11

> By submitting a bill and/or accepting payment, the provider signifies that the service for which payment is sought was performed as described and was necessary, appropriate and properly billed in accordance with accepted industry standards. For example, accepted industry standards preclude upcoding billed services for extended medical appointments when the employee actually had a brief routine appointment, or charging for the services of a professional when a paraprofessional or aide performed the service. Also, industry standards prohibit unbundling services to charge separately for services that should be billed as a single charge. In addition, the provider thereby agrees to comply with all regulations set forth in this subpart concerning the rendering of treatment and/or the process for seeking payment for medical services, including the limitation imposed on the amount to be paid for such services.

12

20 C.F.R. § 30.701(d).

13

14

15

     50.    Additionally, on the claim form, all providers, including Haven, must represent that they are entitled to the funds requested and that the information provided is true:

16

17

18

19

20

21

22

23

> Any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud to obtain benefits provided under EEOIC, or who knowingly accepts benefits to which that person is not entitled, is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine, imprisonment, or both. Any change to the information provided on this form, once it is submitted, must be reported immediately to the district office responsible for the administration of the claim. I hereby make a claim for benefits under EEOIC and affirm that the information I have provided on this form is true.

24

25

Form EE-17A (Jan. 2015).

26

27

28

     51.    "All claims for benefits under the [EEOICPA] must comply with [applicable] claims procedures and requirements . . . before any payment can be made" by the DOL. 20 C.F.R. § 30.110(d).

12

52.     Moreover, "[a] physician, hospital, or provider of medical services or supplies **shall be excluded from payment** under this part if such physician, hospital or provider has … [k]nowingly made, or caused to be made, any false statement or misrepresentation of a material fact in connection with a determination of the right to reimbursement under this part, or in connection with a request for payment; … [k]nowingly furnished treatment, services or supplies which are substantially in excess of the employee's needs, or of a quality which fails to meet professionally recognized standards; … [or] [e]ngaged in conduct related to care of an employee's occupational illness or covered illness that OWCP finds to be misleading, deceptive or unfair." 20 C.F.R. § 30.715(c), (g), and (j) (emphasis added).

53.     Various "statutory provisions make it a crime to file a false or fraudulent claim or statement with the federal government in connection with a claim under the Act. Included among these provisions is 18 U.S.C. 1001. Enforcement of criminal provisions that may apply to claims under the Act is within the jurisdiction of the Department of Justice." 20 C.F.R. § 30.16(a).

**D.     Anti-Kickback Statute**

54.     The federal health care Anti-Kickback Statute prohibits knowingly and willfully soliciting, receiving, offering, or paying "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or kind" for referrals of items or services paid for by federal health care programs. 42 U.S.C. § 1320a-7b(b).

55.     "Remuneration" under the AKS means anything of value. *See, e.g.*, 56 Fed. Reg. 35952 (Jul. 29, 1991).

56.     "Willfulness" under the AKS requires that the defendant intended to violate the law, but a person "need not have actual knowledge of th[e AKS] or specific intent to commit a violation of th[e AKS]." 42 U.S.C. § 1320a-7b(h).

57.     The knowing and willful payment of remuneration violates the AKS where even one purpose of that payment is to induce the referral of federal health program-

13

related business.

58.    Although *receiving* remuneration triggers liability, the AKS also prohibits willfully *offering* remuneration to induce the referral of program-related business. Thus, proof of payment is not required.

**E.    Hospice under Medicare**

59.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain health care services. HHS is responsible for administering and supervising the Medicare program. The Center for Medicare and Medicaid Services ("CMS") is a component of HHS and is directly responsible for administering the Medicare program.

60.    Hospice benefits under Medicare provide palliative care instead of curative care. Palliative care is aimed at relieving pain, symptoms, or stress of terminal illness. It includes a comprehensive set of medical, social, psychological, emotional, and spiritual services provided to a terminally ill individual.

61.    Medicare recipients who elect hospice care agree to forego Medicare services related to the treatment of the terminal condition for which hospice care was elected or a related condition or that are equivalent to hospice care except for services (1) provided by the designated hospice; (2) provided by another hospice under arrangements made by the designated hospice; and (3) provided by the beneficiary's attending physician if that physician is not an employee of the designated hospice or receiving compensation from the hospice for those services. 42 U.S.C. § 1395d(d)(2)(A); 42 C.F.R. § 418.24(e)(1), (2); *see also* Medicare Benefit Policy Manual, Chapter 9, "Coverage of Hospice Services Under Hospital Insurance," Section 10, available at https://www.cms.gov/media/125141; 42 U.S.C. § 1395d(d)(2)(A) and 42 C.F.R. § 418.24(e)). In other words, patients who receive the Medicare hospice benefit no longer receive care that leads to a cure of their terminal illnesses.

/ / /

/ / /

## V.   BACKGROUND

62.   Haven employs over 200 nurses and home health aides who provide its home health and other medical services.

63.   The Ruark Defendants were owners of a company that was a predecessor to Haven. In 2017 they partnered with Defendant Tjalas and incorporated Haven in its current form in May 2018.

64.   Prior to this partnership, Tjalas owned a company called Victory Medical Solutions ("Victory"), which provided home health services for approximately 10 EEOICP patients.

65.   Relator was hired to work at Victory in September 2017 but was transferred to Haven after its incorporation.

66.   Significantly, the care of Victory's EEOICP patients was also transferred to Haven at the same time. Relator was told by Tjalas that this was done in an effort to avoid recoupment resulting from a DOL audit of Victory for (potentially) providing inappropriate therapy. In other words, when faced with a DOL audit, Tjalas shut down his home health company, destroyed records, transferred the patients and employees to another company, and continued to bill the DOL.

67.   Tjalas and the Ruarks own, operate, manage, and/or control Haven and dictate the policies and procedures regarding the allegations at issue in this Complaint.

68.   After this partnership was completed, Haven's EEOICP business grew from 10 beneficiaries to approximately 90.

69.   Haven divides its operations into four departments or divisions: the DOL Division, hospice, Medicare home health, and private duty/companion care.

70.   Relator worked only in the DOL Division, which administers care to the EEOICP beneficiaries as described herein.

71.   Even though Haven's DOL Division had the fewest number of patients, it brought in three times the revenue of any other division, according to "per patient revenue" figures displayed at a meeting of Haven's owners, managers, and directors of

nursing in Scottsdale, Arizona. The amount of care required for each of these EEOICP beneficiaries is substantial and costly because nearly all have terminal illnesses and require extensive skilled care.

72.     Thus, the DOL Division generated Haven's highest revenue and accounted for at least $12 million in revenue in 2019 alone.

73.     Defendants submitted bills to the DOL in the name of one or the other of the corporate defendants.

74.     The DOL program allowed for many services for the EEOICP beneficiaries, including "home health," which is the focus of the allegations in this Complaint.

75.     The DOL has a strenuous preauthorization process before approving the provision of home health services. The DOL requires a letter of medical necessity, which is "a narrative statement, prepared by a qualified physician who has been actively treating the claimant for one or more DEEOIC accepted conditions" that serves as "the physician's independent opinion regarding the claimant's [home and residential health care] needs." EEOICP Manual Version 4.2, Chapter 30, Section 2(o).

76.     The DOL also requires that the physician conduct a face-to-face, in-person examination. 20 C.F.R. § 30.403(c); EEOICP Manual Version 4.2, Chapter 30, Section 3(a)(2)(a); 5(a)(1), (3); 5(b)(1); 7(a)(1); Appendix 1, Exhibit 26-2, p. 3.

77.     All of the required information—including the letter of medical necessity, patient records, and a plan of care—is sent to the DOL to approve or deny the patient for care and payment according to specific time periods, billing codes, regulations, and policies. These specific authorizations would often be for large blocks of time such as 6, 12, or 24 hours of home health care daily.

78.     Typically, a letter from the DOL would authorize care for a six-month period by providing authorized codes and by specifically setting forth the permissible billing for "home" health care (in this example, up to 24 hours per day):

/ / /

16

The Division of Energy Employees Occupational Illness Compensation (DEEOIC) recently received a request for authorization of home health services for your accepted work related illness(es). After a review of your request, DEEOIC authorizes the following home health care services for the period of February 5, 2019-August 3, 2019:

- Registered Nurse (RN)[Billing Codes T1030 (RN-per diem) or S9213 (RN-hourly] and Licensed Practical Nurse (LPN) [Billing Codes T1031 (LPN-per diem) or 89124 (LPN-hourly)] up to 24 hours per day for care related to the accepted conditions.

*See e.g.* DOL Authorization Letter for Patient J.S.[1]; EEOICP Manual Version 4.2, Appendix 1, Exhibit 30-4.

79.     At all relevant times, the DOL published and defined the billing codes it authorized for approved services rendered to EEOICP patients. The codes, which Defendants used or caused to be used to bill the DOL for in-home care they rendered by telephone or not at all, include the following: T1019: Personal Care Attendant (PCA) (15 minutes = 1 unit); T1020: Personal Care Services (PCA) Per Diem (8 hours); T1030: Nursing Care, In-Home, by Registered Nurse (RN), Per Diem (8 hours); T1031: Nursing Care, In-Home, by Licensed Practical Nurse (LPN) Per Diem (8 hours); S9123: Nursing Care In-Home Registered Nurse (RN) Hourly Code (less than 8 hour care); S9124: Nursing Care In-Home License Practical Nurse (LPN) Hourly Rate (less than 8 hour care). EEOICP Manual Version 4.2, Appendix 1, Exhibit 30-4.

80.     At all relevant times, applicable laws, instructions, and requirements permitted the DOL to authorize, approve, and make payment for these codes only if the provider rendered the corresponding care in the patient's home. *Id.*

81.     Upon receiving the letter of approval and authorization by the DOL for in-home care, Haven was permitted to start billing the DOL, and the DOL was permitted to

---

[1] For privacy, HIPAA, and Protected Health Information ("PHI") reasons, Relator identifies patients by only their initials. Relator can and will provide additional identifiers for all patients referenced in this Complaint upon request by Defendants or order of the Court.

17

pay Haven, per the DOL's regulations, instructions, and requirements.

82.     Tjalas or Haven's Director of Nursing would assign nurses and/or HHAs to the patient.

83.     Haven never had enough employees on its payroll to provide the care the DOL authorized for the EEOICP beneficiaries for which it undertook care. It was therefore physically impossible for Haven employees to deliver the amount of in-home care its patients required.

84.     However, regardless of its staffing, Haven's policy and practice was to bill the DOL for the full number of hours the DOL authorized for nursing, regardless of whether a nurse was available and regardless of whether Haven provided that amount of in-home care (which it typically did not).

85.     In order to do this, Defendants used various schemes that have defrauded and continue to defraud the Government in violation of the FCA.

## VI.     DEFENDANTS' FRAUDULENT PRACTICES

### A.     Most of the home health care for which defendants billed the DOL was neither health care nor in the patient's home but rather was, when done at all, a series of short phone calls to the patient.

86.     The DOL typically authorized Haven's EEOICP patients to receive in-home nursing care in blocks of time (6, 8, 12, or 24 hours) per day, usually 7 days per week. The patients received approval for this amount of care because they had very serious illnesses that required extensive daily skilled nursing care until his or her death, which was usually from chronic, incurable, painful diseases.

87.     In-home nursing care includes, among other things, giving injections, starting or servicing intravenous pumps or lines, and addressing feeding tube issues. Importantly, nurses are to be bedside for an entire shift (a shift for one nurse is up to 12 continuous hours) to perform these and other medically necessary duties.

88.     It is required, medically ordered, and commonly understood for that care to be rendered in person in the patient's home. But instead of going to patients' homes, Haven's nurses often provide care by telephone, if at all.

89.     Under Haven's scheme, most of the actual hands-on patient care is done by family members or aides or by no one at all. Family members and aides, who are not trained, give medications, change dressings, look for signs of problems with IVs or feeding tubes, record weight, blood pressure, symptoms, and report these observations to a Haven nurse by phone. This "care" is abysmally less skilled care than the DOL requires and the physician ordered. Moreover, this "care" is of a quality that fails to meet medically recognized standards.

90.     The Haven nurse then uses the information and observations of the family member or aide to write a nursing note in the patient chart.

91.     In many instances, the chart reflects that telemedicine was used. Sometimes the patient signed a consent for telehealth (the scope and validity of which is suspect because its stated purpose is "to enable health care providers at different locations to share individual patient medical information for the purpose of improving patient care"). But nowhere has the patient knowingly waived in-home nursing care in favor of phone calls. Regardless, the DOL does not and would not pay in-home nursing rates for it; the DOL does not permit telehealth for in-home nursing. These phone calls were often 10-15 minutes during the day, yet Haven billed the Government for typically between 6 and 24 hours a day of in-home care.

92.     Billing for telehealth or phone calls in lieu of in-home health care is not permissible under the EEOICP. First, the DOL is paying for "in-home" care. Nowhere does the program authorize telehealth or phone calls. Second, the procedure codes authorized were for care that would be impossible to provide by telephone. Third, applicable regulations and program require that care must be rendered in person and at home. Finally, DOL personnel confirmed this requirement when asked by Relator numerous times. Relator, Rhonda Parks, Monica Gandy, and Sarah Webster relayed that information to Defendants many times.

93.     Nevertheless, Defendants submitted and continue to submit bills to the DOL for these phone calls as if they were actually providing full shifts of in-home

nursing care. When Haven nurses spend 20, 30, or 60 minutes on the phone with the patient a family member or an aide, Haven bills the DOL for a full nursing shift (6, 8, 12, or 24 hours) of actual in-home nursing care. Even knowing this was improper, Haven submitted bills for the full amount the DOL authorized even though services were not provided.

94.     More than half of Haven's approximately 90 EEOICP patients regularly received—and Defendants billed the DOL for—nursing care in this manner.

95.     For example, the DOL authorized Haven patient M.G. to receive in-home nursing care. However, patient M.G. mostly received care through his telephone and his daughter and grandchildren instead. In-home nursing care is designed, in part, for patient safety, the importance of which patient M.G.'s case demonstrates. Patient M.G. passed out and fell at home because of a heart issue, at a time a nurse should have been with him, but was not. Because no nurse was present and his family was not at home, he lay on the floor without treatment for hours. Haven's bill to the DOL reflects that its nurse was "in-home" at the time of the fall and while he lay on the floor. The incident report and hospital emergency room records reflect otherwise.

96.     Patient D.A. also fell at home while alone, during a time Haven's bill to the DOL indicated its nurse was present. Medical records verify that, in fact, no nurse was present.

97.     Other egregious examples of Haven EEOICP patients who regularly received phone calls instead of in-home nursing are patients J.S., S.P., J.H, R.F., I.M., D.A., M.O., and M.N. Relator knows Haven billed the DOL for in-home services that Haven did not render to these patients because she saw the patients' bills that Haven submitted to the DOL.

1.     Patient J.S.

98.     On March 6, 2019, the DOL approved patient J.S., who lived in Indiana, for skilled nursing 24 hours a day, seven days a week. In its decision letter, the DOL specifically authorized home health care services for the billing codes T0130 (RN-per

diem) or S9123 (RN-hourly) and T0131 (LPN-per diem) or S9124 (LPN-hourly) for up to 24 hours per day for care related to the accepted conditions. These codes are only reimbursable for home health services rendered "in-home."

99.     After meeting with patient J.S. on February 18, 2019 (which was the only in-person interaction he had with the patient), Tjalas immediately flew back to Arizona and never saw him again. Thus, no in-home care was provided. The only place in-home care appeared was on the bill.

100.     Several entries in patient J.S.'s medical records establish that Haven was providing telehealth only, not the in-home services the DOL approved, required, and paid for. For example, the medical record for February 18, 2019, states: "No major changes reported via tele-monitoring. . . . Continuous tele-monitoring w/nursing supervision. Patient and family aware of Tele-health nursing policy and procedure. They are comfortable with q 2-3 check ins and notifying this nurse of any changes, concerns, or questions during the day. Family has been trained on provided equipment for monitoring of vital signs."

101.     Patient J.S.'s medical record also states:

- "Pt. declined vital signs and blood sugar checks per wife."
- "Self cath. with assist. of wife"
- "Vitals declined by spouse's wife."
- "Per wife's report" and "Pt wife stated that . . ."
- "Spouse instructed to call this writer with any questions or concerns."
- "This writer performed a telephonic care coordination and multiple texts and phone calls to staff throughout the week."

102.     Haven went so far as to relegate patient J.S.'s medication administration—a skilled nursing task reserved to a licensed RN—to his wife's responsibility. The letter of medical necessity Haven submitted to the DOL on the patient's behalf stated that he "will require immediate round the clock skilled nursing care," because, among other reasons, his "chronic pain requires narcotic medications and diligent administration, monitoring

1    and assessing the effectiveness of these medications to keep the patient comfortable."

2    Although Haven represented to the DOL that this would happen, it did not. As noted in

3    patient J.S.'s chart, his "wife gives patient all medications," including oxycontin.

4              2.    Patient S.P.

5         103.    The DOL approved patient S.P. for in-home nursing for 24 hours per day,

6    seven days per week. However, not only did all of the nurses do his consultations via

7    telehealth, they spent very little time interacting with him. Although Haven has staff

8    (including four or five nurses) who lived in patient S.P.'s area, even those staff provided

9    him telehealth, as did nurses Hornish-Hensley, Hawkins, and Tjalas.

10        104.    Instead of providing care itself, Haven also paid patient S.P.'s wife $1200

11   per week to be an HHA. This is improper for many reasons as set forth below, including

12   the fact that the DOL did not authorize any HHA hours.

13        105.    Patient S.P. is one of many patients whose care was compromised because

14   Haven provided it via telemonitoring instead of in-home as ordered and required. On

15   June 22, 2019, while patient S.P.'s assigned nurse was providing telemonitoring only,

16   patient S.P. fell at home and needed assistance. Injured, he called Relator because he said

17   he could not get a nurse to answer the phone. Relator then sent a text message to patient

18   S.P.'s assigned nurse stating: "Who is supposed to be with [patient S.P.] [no] one is

19   answering he is hurt urgent call now". The assigned nurse responded by texting that she

20   was not there and another nurse was en route. Because of Haven's failure to provide in-

21   home care, patient S.P. went to the emergency room. This incident is documented in text

22   messages in Relator's possession.

23        106.    In a particularly egregious circumstance, on July 6, 2019, patient S.P.

24   coughed up material that concerned him. Because no nurse was in his home, however, he

25   could only take photos and text them to Relator asking for someone to help him: "Hey

26   good morning … I've been coughing these little white pill … things up this morning and

27   could you send that over to the nurse and tell her I asked her what the hell she thinks that

28   is".

107.    Similarly, On May 10, 2019, patient S.P.'s nurse sent a text message confirming that she would be providing care for patient S.P. via "tele health."

### 3.    Patient J.H.

108.    The DOL authorized patient J.H. to receive in-home skilled nursing for 12 hours per day, seven days a week. Marie Porter (former Director of Nursing) and Joyce Avery (the new Director of Nursing) assigned Angie Porter to be J.H's nurse. Later, Hornish-Hensley continued to assign Ms. Porter to patient J.H. However, Porter, Avery, and Hornish-Hensley knew Angie Porter would not personally see patient J.H. because she was pregnant. Thus, Angie Porter did only telehealth consultations.

109.    Ms. Porter had her baby in January 2020, and Haven documented, billed, and was paid for visits she allegedly made even though she was in the hospital having her baby. Relator informed Hornish-Hensley and Ellyn Hawkins of this situation, but Relator was told because Ms. Porter did not let Hornish-Hensley know of her situation and absence from work, the charges would stay and would be billed. Hawkins even received a picture of Ms. Porter's baby via text message and still passed and approved those charges for billing. Hornish-Hensley told Relator that Haven would not lose the revenue for this patient, even though Relator informed her the services were not rendered (in home or at all) and she knew Ms. Porter was in the hospital having a baby while documenting 12-hour visits with patient J.H.

### 4.    Patient R.F.

110.    For a significant period of time, Tjalas and Hawkins did only telemonitoring from Tucson, Arizona, for patient R.F., who lived in West Virginia. A nurse whom Haven paid to go from Arizona to West Virginia to provide care also primarily did telemonitoring for the shifts. Patient R.F.'s wife was also paid to be an HHA, even though the DOL did not approve any HHA hours.

### 5.    Patient I.M.

111.    Haven rendered "care" for patient I.M., who lived in Florida, mostly via telehealth. Patient I.M. confirmed what she called "tele-nursing" arrangements, as

23

opposed to in-home care, in text messages she sent to Relator on October 2, 2019. Hornish-Hensley also confirmed, in text messages to Relator beginning on September 7, 2019, that patient I.M. was receiving "telehealth" services.

### 6.    Patient D.A.

112.    Patient D.A., now a former Haven patient, lived part-time in Washington and part-time in Montana and was to receive in-home nursing care from Haven in both states. However, most, if not all, of patient D.A.'s "in-home" nursing care was rendered by telephone. Ultimately, patient D.A. fired Haven because few, if any, of his "visits" were in person and he had not received any "visits" or telephone calls for months. Nevertheless, Haven billed the DOL for nursing care for most, if not all, of the hours of care that the DOL authorized for patient D.A.

### 7.    Patient M.O.

113.    Patient M.O. is extremely sick and called Relator while she was in Washington on January 16, 2020. He told Relator that he wanted a nurse there and did not want telehealth. He repeatedly passes out and feels someone needs to be there. However, five of patient M.O.'s seven approved days per week were done via telemonitoring.

### 8.    Patient M.N.

114.    Patient M.N. was seen primarily via telemonitoring. Even telemonitoring was hit-and-miss since patient M.N. often did not respond to Haven's phone calls. She transferred to another company, but Haven nurses were still documenting notes even though they had no contact with her.

### 9.    Other Patients

115.    Other EEOICP patients whose care Haven provided via telephone, if at all, include the following:

/ / /

/ / /

/ / /

| | Patient Name | Office Responsible for Patient Care | Patient Location |
|---|---|---|---|
| 1 | | | |
| 2 | J.F. | Tucson, AZ | Goodyear, AZ |
| 3 | W.C. | Tucson, AZ | Bullhead City, AZ |
| 4 | J.A. | Richland, WA | Tri-Cities, WA |
| 5 | H.B. | Richland, WA | Tri-Cities, WA |
| 6 | M.B. | Richland, WA | Tri-Cities, WA |
| 7 | J.D. | Richland, WA | Tri-Cities, WA |
| 8 | N.D. | Richland, WA | Tri-Cities, WA |
| 9 | S.E. | Richland, WA | Tri-Cities, WA |
| 10 | J.F. | Richland, WA | Tri-Cities, WA |
| 11 | D.G. | Richland, WA | Yakima, WA |
| 12 | M.M. | Richland, WA | Tri-Cities, WA |
| 13 | C.M. | Richland, WA | Tri-Cities, WA |
| 14 | H.S. | Richland, WA | Tri-Cities, WA |
| 15 | B.P. | Richland, WA | Tri-Cities, WA/Yuma, AZ |
| 16 | R.W. | Richland, WA | Tri-Cities, WA |
| 17 | T.W. | Richland, WA | Tri-Cities, WA |
| 18 | J.R. | Richland, WA | Tri-Cities, WA |
| 19 | R.J. | Richland, WA | Tri-Cities, WA |
| 20 | D.C. | Richland, WA | Tri-Cities, WA |
| 21 | D.L. | Richland, WA | Tri-Cities, WA |
| 22 | J.L. | Richland, WA | Tri-Cities, WA |
| 23 | M.C. | Richland, WA | Tri-Cities, WA |
| 24 | G.O. | Richland, WA | Tri-Cities, WA |
| 25 | L.P. | Richland, WA | Tri-Cities, WA |
| 26 | N.S. | Richland, WA | Tri-Cities, WA |
| 27 | E.A. | Richland, WA | Tri-Cities, WA |
| 28 | E.G. | Richland, WA | Tri-Cities, WA |

| | | |
|---|---|---|
| R.D. | Richland, WA | Oregon |
| J.L. | Richland, WA | Oregon |
| J.M. | Richland, WA | Oregon |
| B.C. | Silver City, NM | Silver City, NM |
| J.D. | Silver City, NM | Silver City, NM |
| J.G. | Silver City, NM | Hurley, NM |
| M.L. | Silver City, NM | Silver City, NM |
| B.R. | Silver City, NM | Reserve, NM |
| W.C. | Silver City, NM | Three Way, NM |
| P.O. | Silver City, NM | Silver City, NM |

**B.      Haven paid kickbacks to families to induce patients to become and remain Haven patients.**

116.     One way Haven was able to bill for large blocks of in-home care when nurses were not in the patients' home was to recruit family members to perform the services, even putting some of those family members on Haven's payroll. Haven paid patients' wives, children, and grandchildren to render patient care to Haven patients. Based on $15 per hour and calculated for 12 or 24 hours per day, family members often received between $1200 and $2400 per week. This arrangement benefitted Haven in several ways.

117.     First, it was a powerful financial inducement to patients to hire or retain Haven. Patients specifically told Relator this. Defendant Tjalas specifically told Relator, on many occasions, "if we pay their family, the patients will never leave" or words to that effect.

118.     Second, it resolved any patient objections to the absence of in-home nursing.

119.     Third, it allowed Haven to perpetrate its scheme by having someone on-site to relay observations, vital signs, and alerts so it could author the nursing notes that were a prerequisite to DOL payment. 20 C.F.R. §§ 30.700, 30.701.

120.    Fourth, it generated enormous profits for Haven at the rate of approximately $105/per hour, every hour of every shift, since the DOL paid approximately $120/per hour for in-home nursing minus the $15 or so per hour that Haven kicked back to the family.

121.    Haven EEOICP patient J.S., M.G., D.A., R.F., S.S., S.P., and T.B. are examples of this fraudulent practice.

122.    In instances when the DOL approved an in-home nurse plus an in-home health aide, Haven hired a family member to serve the role of an aide. In these instances, Haven's profits are even greater because Haven retains more profit for the nurse and a portion of the DOL HHA payment (after paying the family member).

123.    In fact, this occurred as recently as January of this year. On January 7, 2020, Haven nurse Roberta Graves sent an email to Tjalas, the Ruarks, and others regarding a new Haven EEOICP patient, D.P., in Sweetwater, Arizona. The DOL approved D.P. to receive 84 hours of in-home nursing care per week and 105 hours of in-home HHA care per week from December 5, 2019 through June 1, 2020. The email blatantly and explicitly stated that patient D.P.'s "wife and granddaughter will be doing the HHA. The wife will do 81 hours and then the granddaughter . . . will do 24 hours. We are entering them now." Haven provided none of the HHA care ordered by the physician and, upon information and belief, most, if not all, of the nursing was done via telephone, if at all.

124.    When a federal government program is paying for health care, payments by Haven or any other health care provider to a hospital, a laboratory, a physician, a patient, or a patient's family that are designed in part to influence choices of care or choices of care providers violate federal Anti-Kickback laws and are illegal.

125.    Haven exploited these patients and their family members who were often desperate for money and would thus keep the fraud a secret. The patients' families had to quietly watch their loved ones suffer and die without the help or care the Government made available and paid for.

**C.    Some of the home health care defendants billed utilized unqualified, untrained, unsupervised and/or unlicensed caregivers.**

1.    Unlicensed Providers

126.    Haven, based in Arizona, provides home health care to EEOICP patients in many states. It is axiomatic that a health care provider must be licensed and qualified to provide care in the state in which the patient is located and the care is rendered. The DOL—and indeed every government agency—requires appropriate licensure and qualifications of all providers in federal health care programs, including EEOICP; it is material to government payment.

127.    Patient D.A., discussed above, lived part-time in Washington and part-time in Montana and was to receive in-home nursing care from Haven in both states. Haven assigned nurse Joyce Avery, who was located and licensed in the state of Washington. Ms. Avery never traveled to Montana to see the patient. Moreover, she was not licensed to render either nursing care or telemedicine care in Montana. Most, if not all, of patient D.A.'s "in-home" nursing care was rendered by telephone, but Haven billed the DOL for it anyway.

2.    Unqualified and Unsupervised Caregivers

128.    As noted above, Haven paid family members, usually wives of patients, to act as caregivers for the reasons explicitly stated above.

129.    In addition to its illegality, it is harmful to the patients because family members are usually unqualified to give the care that Haven is paying them to provide. Specifically, Haven paid the wives of EEOICP patients J.S., S.P., D.A., and R.F. to render patient care in lieu of in-home patient care by a registered nurse. These wives lack formal training and were unsupervised in their performance of the nursing functions they were being relied upon to perform. It is below medically recognized standards of care to provide nursing by telephone through an untrained, unqualified lay person.

130.    As described above, patients M.G. and D.A. both fell at home when a nurse should have been with them, but was not (even though Haven's bills to the DOL said otherwise). An on-site nurse would have been available to provide immediate emergency

28

care which, for patient M.G. (who had a cardiac issue), may have made a medically significant difference. The axiom in cardiology is time is muscle, referring to the crucial need to treat heart patients immediately. Patient S.P. also fell at home at a time that a Haven nurse should have been in attendance.

131.    Patient J.S.'s letter of medical necessity explains the extreme importance of skilled, in-person, nursing care:

> [Patient J.S.] **cannot be left alone** due to his constant pain, blindness and cognitive decline. He will require **immediate round the clock skilled nursing care**, post discharge for his impending terminal Malignant Neoplasm of the Head of the Pancreas; Horseshoe tear of retina; Senile Nuclear Cataract; After Cataract Nos. [Patient J.S.'s] chronic pain requires narcotic medications and diligent administration, monitoring and assessing the effectiveness of these medications to keep the patient comfortable, by providing and adjusting palliative care.

Patient J.S. February 5, 2019 Emergent Letter of Medical Necessity at 2 (emphases added; diagnosis codes omitted). Yet most of this patient's care, and others' at Haven, was done via telephone, by his wife, or not at all.

**D.    Haven continues to bill the DOL for services rendered to patients even after they have left its care.**

132.    Once the DOL authorizes care, Haven usually, if not always, bills to the limit of the authorization—whether or not the patient is alive or still in its care. For each EEOICP patient, the DOL authorizes specific amounts of in-home care and supplies (hours and days of care and specific medical equipment, for example) in six month increments as the treating physician orders and deems medically necessary.

133.    Sometimes, the patient dies or decides to leave Haven's care before all of the authorized care and supplies have been delivered. However, a patient's death or voluntary departure does not stop Haven and its owners from billing the DOL for the maximum authorized amounts.

134.    Patient J.S. is a good example of this fraud. He died prior to Haven delivering a portion of the care the DOL authorized during a six-month period. Tjalas literally invented post-death case management visits, created false records, and used them as a basis to bill the DOL to capture every dollar of pre-authorized care.

135.    Patient M.N. was not receiving any in-home care, nor was she receiving telephone calls from a nurse. So she transferred her care to a competitor of Haven. Not only did Haven bill the DOL for care it did not render while patient M.N. was in its care, Haven continued to bill for care it did not—and could not—deliver after she left Haven's care.

136.    Relatedly and relevant, defendant Tjalas is the sole owner of Act NOW DME, a durable medical equipment ("DME") company that Haven exclusively uses to provide DOL-authorized medical equipment to Haven patients. As a result, Tjalas financially profits from both the patient care and patient equipment. Medical equipment includes expensive items such as hospital beds, wheel chairs, scooters, oxygen equipment, transfer lists, and infusion pumps. Relator is personally aware of at least seven Haven and Victory patients for whom Tjalas billed the DOL for DME supplied by Act NOW DME and billed after the patient died. Defendant Tjalas submitted or caused to be submitted false claims for that DME equipment to the Government.

**E.    Defendants Falsified Medical Records**

137.    Every medical record Haven created, reflecting that in-home nursing care was rendered, when in fact telephone calls were made instead, is false. Every medical record certifying that the attesting nurse provided patient monitoring, patient observations, or other nursing duties in person, when the nurse actually did so by telephone or not at all, is false.

138.    In addition, to serve its own interests, Haven falsified medical records in other ways because the DOL required the existence and preservation of medical records. 20 C.F.R. §§ 30.700, 30.701.

/ / /

139.    Patient D.G. was one of the original patients transferred from Victory to Haven. After being a Haven EEOICP patient for several months, in late 2018 or early 2019, patient D.G. threatened to terminate Haven as his home health provider because his in-home nursing was mostly done by telephone. The assigned nurse, Marie Porter, had not made chart entries for nearly the entire period. In order to fraudulently remedy this glaring omission, Defendant Tjalas created a series of completely fictional nursing visit "templates" utilizing measurements and observations from various other patient charts that were used to populate patient D.G.'s medical records. The templates were used on a random, rotating basis to prevent identical measurements and observations to be used shift after shift, day after day from being obvious. In this way, Haven concealed the fraudulent charting.

140.    Haven also falsified medical records via the fictional charting described above, although to a lesser extent, in the charts of patients J.S., J.H., and D.A.

141.    Defendants also misled the DOL through falsified chart entries because they knew that care outside of the home was not billable. Haven instructed its nurses, HHAs, and personal care attendants ("PCAs") to falsify medical records to show, for example, trips to the drug store were billed as "assisted patient with medications" and trips to the grocery store were billed as "assisted patient with meals." Defendants even set up a chart review process to ensure that these chart entries were sufficiently falsified to receive DOL approval.

**F.    Other Harmful and Unlawful Practices**

1.    <u>Defendants cause the submission of false claims for Haven EEOICP patients who elected hospice services through Medicare.</u>

142.    Medicare's hospice benefit, available to patients with a life-expectancy less than six months, covers all care, including doctors, nurses, medical equipment and supplies, related to a terminal illness that is necessary to keep the patient comfortable. One important condition for providing this benefit is that Medicare will no longer pay for care meant to cure the patient's disease as long as the patient remains in hospice.

143.   Many of Haven's EEOICP patients are enrolled in hospice care paid by CMS. Haven knows which of its patients are hospice patients, even noting it in the chart.

144.   Haven simultaneously bills as if it provides nursing care, medical equipment, and supplies that duplicate what hospice is already providing. By so doing, Haven is causing the Government to pay twice (once by the DOL and once by CMS) for overlapping and duplicative medical care and supplies. Haven, which also provides hospice services through Medicare and therefore knows or should know the requirements of Medicare's hospice benefit, is aware of the impropriety of this practice.

145.   Relator believes that Haven caused the double billing of many patients in this manner, including patients J.S., M.G., N.D., R.F., R.W., and S.S.

     **2.**   <u>Defendants submitted false claims to the DOL for "care" rendered to a non-EEOICP patient.</u>

146.   The "care" Haven provided to EEOICP patient D.A., which is an example of many of Haven's fraudulent practices, gives rise to yet another fraudulent practice. The DOL approved patient D.A. for in-home nursing care 6 hours a day/7 days a week. Most of that care, however, was done by telephone. On the infrequent occasions that nursing care was rendered in-home, the recipient of that care was the patient's mother-in-law who was neither an EEOICP beneficiary, nor, obviously, approved for care by the DOL. Haven nevertheless billed the DOL for in-home nursing care rendered to the patient's mother-in-law. The motive for this particular fraud is based, in part, on the fact that the patient's wife, the daughter of the actual non-approved patient, was already on Haven's payroll as an uncertified, unqualified, unsupervised caregiver. Nursing care for her mother was an additional illegal financial incentive to the patient and/or his family.

**G.     Defendants knowingly engaged in these fraudulent schemes**

147.   Defendants were involved in, had knowledge of, and/or directed all of the conduct, as described above.

148.   Relator also repeatedly discussed many of these issues with Defendants and even informed Defendants she had reported certain of the fraud to the DOL.

149.    Relator was concerned about patients' safety and well-being. She was also concerned about the behavior she witnessed, which some patients reported to her. Despite knowing they were committing fraud, Defendants continued to submit or cause the submission of bills to the Government.

        1.    <u>Defendants were involved in and were well aware of the fraudulent practices.</u>

150.    Tjalas and the Ruarks knew that short telemedicine phone calls instead of in-home visits were occurring because they created the company's practices, were involved in assigning personnel to patients and scheduling and the daily running of the company, and specifically oversaw and authorized the billings.

151.    They authorized billing even when they knew, for example, that a nurse was not located in the same state as the patient or, for another example, Haven nurse Angie Porter was actually giving birth to her child in January 2020 at the **same time** that she was billing for in-home health services she purportedly rendered to patient J.H. Haven billed the DOL for these services even though Relator had informed management that no services were rendered.

152.    Defendants suggested and/or directed the telemonitoring since at least the beginning of Relator's employment in 2017. For example, in November 2017, Tjalas sent an email to nurse Roberta Graves stating "can we do have [sic] a nurse visit 7 hours a day, they can do the 12 a day via telemonitoring (see the link attached VERY CONFIDENTIAL) AND CALL ME to clarify this thanks!" Ms. Graves responded: "I think that the idea of telemonitoring is fine. . . Put in for the 12 hours a day. Give me the flexibility of the telemedicine. I will work it out."

153.    Defendant Kevin Ruark requested a list of those patients who were being seen via telehealth (which Relator created by asking Ms. Graves for a list of those patients to whom telehealth was provided more than 50% of the time). Haven had purchased monitoring tablets from MetTel to use when nurses were not in the home. The devices were expensive; since Kevin Ruark was responsible for Haven's finances, he

1   inquired whether the nurses were using them. Upon receiving the telehealth list of

2   patients receiving more than 50% telemedicine care, and learning that the nurses were

3   actually just using their personal cell phones, he returned the units to MetTel.

4       154.    Defendants directed and orchestrated the payments to family members and

5   stated openly that it is a great way to keep patients from going to competitors. Recently,

6   on January 7, 2020, Ms. Graves reported to Tjalas, the Ruarks, and others, via email, of a

7   new patient where the wife and granddaughter would be doing the 15 hours a day of

8   HHA approved by the DOL.

9       155.    Defendants also knew that time was being entered after patients left Haven

10   because Tjalas was one of the people actually entering the time, and he instructed and

11   paid Ellyn Hawkins and others to do so as well.

12       156.    Tjalas was well aware of Haven's pattern and practice of providing services

13   by telephone since he introduced telehealth to patients. On at least two occasions, Relator

14   was present with Tjalas when he signed up DOL patients. Relator heard Tjalas tell the

15   patients that there would be instances where an in-home visit would be objectionable to

16   the patient and they could have nurses call the patients. The clear implication was that

17   these phone calls would be infrequent and would be the patient's choice.

18       157.    Tjalas also owns Act Now DME and personally directs the provision of

19   unnecessary equipment discussed above, even after patients died.

20       158.    Defendants were also involved in and/or orchestrated the other fraudulent

21   behaviors, including obtaining letters of medical necessity that were false and otherwise

22   falsifying documents and records made or used to get claims paid.

23       2.    Relator repeatedly discussed the illegality of Haven's practices with
        Defendants and reported their fraud to the DOL

24

25       159.    Relator had multiple conversations with Tjalas and the Ruarks during

26   which she told them that billing the DOL for telehealth visits constituted fraud, as did the

27   other allegations contained herein.

28   / / /

34

160.    Relator explained repeatedly to Tjalas and Jamin Ruark that telemedicine was impermissible and that based on her prior billing experience, there would be a code on point if telehealth visits were allowed, which there was not.

161.    Relator also raised the issue on more than one occasion with Rhonda Parks, Haven's biller, who agreed with Relator but was given the same directive from Tjalas and the Ruarks.

162.    On multiple occasions throughout 2018 and 2019, Relator, accompanied by Parks, spoke to Jamin Ruark and explained how uncomfortable she and Parks were with Haven billing for telehealth visits. However, they were again told to continue billing, and the fraud continued.

163.    Relator also specifically and repeatedly discussed her concerns regarding fraud with Tjalas, Marie Porter, and Ellyn Hawkins.

164.    Initially, Tjalas and the Ruarks attempted to assure Relator that the telemedicine practice was appropriate. However, in early 2019, Relator inquired of LaTrice White, a Senior Claims Examiner at the DOL, who confirmed that seeing patients via telehealth was not permissible and that authorization for in-home care means the care must be done in the home. Relator specifically forwarded to Defendants what the DOL had told her, but Defendants ignored her and took away her responsibilities.

165.    In December 2018, Relator complained about Tjalas and others billing for patients who had left and/or had died. On December 14, 2018, Relator reported information to the DOL showing the patients who were deceased and the charges and services that Act Now DME overbilled. Relator told Defendants how much must be refunded based upon what she found.

166.    In April 2019, Relator uncovered visits Tjalas had added for patient J.S. before he was authorized by the DOL and before Haven even met the patient. She emailed Kevin Ruark begging for intervention. Finally, it was determined, after others were made aware of the blatant fraud, that it should not be billed. But that did not stop the fraud from continuing.

167.    In July 2019, the DOL reached out to Relator regarding a particular patient, J.S., for which it was "auditing." Upon gathering the file for the DOL, she found that Tjalas had added 16 four-hour case management visits for himself several months after the client died and the file was closed. Relator also learned that Tjalas had bypassed the normal quality assurance process to add these "copy and paste" format notes and ensure they were billed. Relator forwarded the file to the DOL and informed Tjalas of the DOL inquiry.

168.    In August 2019, Relator emailed Jamin Ruark informing him of what had happened and reminding him of Tjalas' attempted fraud on the same patient in April 2019.

169.    Relator also consistently told Kevin Ruark about problems during weekly revenue and billings meetings and wrote emails addressing the financial or billing issues that needed corrections. When she tried to report these same issues to Tjalas or Jamin Ruark, they told her to tell Kevin Ruark. Kevin Ruark never responded to any of the issues she repeatedly addressed.

170.    These issues of fraud became so contentious that Relator was removed from various roles at Haven and ultimately pushed out.

171.    Relator is not aware that Haven disclosed, repaid, or otherwise corrected any of the overpayments it received.

        3.    <u>Haven's training and its policies and procedures acknowledge the impropriety of their conduct.</u>

172.    Since 2018, Relator began regular staff trainings, some of which addressed fraudulent billing. However, Tjalas walked in on one of those trainings in late 2019 when Relator was instructing staff about fraud issues and told staff not to listen to her. She was no longer permitted to conduct trainings.

173.    Haven's own employee handbook admittedly and specifically prohibits Haven's behavior and acknowledges that employees must not document fraudulently, must be licensed, and must only bill for care provided to the patient:

- "any employee involved in the documentation of patient care in a fraudulent manner will be terminated."
- "Any professional who applies for an opening in this company must submit professional licensure before employment and submit a photocopy of valid professional license."
- "Haven Home Health Care ensures that bills to the Medicare fiscal intermediary, other insurance companies, and patients reflect only the care or services provided to the patient."

174.    Haven's fraudulent practices were egregious not only because they exploited vulnerable, terminally-ill patients and federal benefits designed to care for them, but also because they deprived those patients of the home health services they needed but did not receive and placed their health and safety at risk.

175.    At all relevant times, the DOL did not allow for in-home health services to be rendered via telemedicine—and for good reason. Often, as the patient examples demonstrate, patients require assistance and treatment that can be rendered only in person. Relator's allegations and supporting evidence establish that Haven's fraud compromised patient safety, deprived federal programs of the benefit of their bargain, and violated applicable statutes and regulations.

## VII.   DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT

176.    By knowingly seeking payment for services provided in violation of material requirements of federal statutes and regulations, Defendants, by and through themselves and/or any related companies, presented, or caused to be presented, false or fraudulent claims for payment to the Government.

177.    The EEOICP requirements are material to the Government's payment decisions because they relate directly to how much the Government is permitted to pay for services. The Government is prohibited by law from paying for services that are not

1  provided at all or are not provided as required by law.

2      178.   Every document Defendants submitted or statement Defendants made to

3  the Government in connection with requests for payment in the circumstances described

4  above is a false or fraudulent claim for payment or approval.

5      179.   By knowingly seeking payment for medical services in violation of material

6  regulatory requirements, Defendants also made, used, or caused to be made or used, false

7  records and statements material to these false claims for payment.

8  **VIII.  RETALIATION**

9      180.   During her employment, Relator confirmed the existence and scope of the

10  fraud at Haven through interactions with multiple Haven employees and patients in

11  various locations. Relator reported the fraud she observed multiple times to Haven, but to

12  no avail. Ultimately, she then reported Haven's conduct to the DOL. After she made

13  reports of Haven's misconduct, Haven harassed and retaliated against Relator, ostracized

14  her, pushed her out of her role as Administrator, and ultimately forced her termination.

15  Relator could not continue to be part of an entity that engaged in fraud, took advantage of

16  elderly and vulnerable patients, and threatened patient health by failing to provide

17  appropriate care or any at all. When Haven would not stop its conduct, and after being

18  harassed, threatened, and retaliated against, she was forced to end her employment.

19      181.   Haven's intent to cover up its knowing fraudulent conduct is evident in its

20  pattern of harassment and retaliatory against Relator, who refused to engage in the

21  schemes and made multiple reports, both internally and externally, about Haven's

22  fraudulent practices. Her challenges of the conduct were met with resistance, criticisms,

23  and overtly threatening behavior. Haven's continued pattern of retaliatory and harassing

24  conduct, and significant changes to the conditions of Relator's employment, ultimately

25  forced her to terminate her employment.

26      **A.   Relator Was a Successful Performer at Haven.**

27      182.   Relator is an experienced manager with over 15 years of administration,

28  management, and business operations experience. Throughout her employment, which

1  began on September 21, 2017, Relator worked at Haven's Tucson location as Corporate

2  Administrator for the DOL Division. In that capacity, Relator had significant

3  responsibility, including oversight over the Tucson, Washington, Farmington, and Silver

4  City offices. As a part of those duties, Relator participated in weekly video meetings with

5  each office to discuss business operations and planning. Relator was also the Director of

6  Human Resource Administration and Management and was responsible for billing and

7  collections.

8       183.   No performance reasons warranted Relator's treatment.

9       184.   The DOL Division and its patient census grew substantially during

10 Relator's tenure. Much of that growth was due to Relator's significant and valuable

11 efforts.

12      185.   Evidencing her success, on or about June 20, 2019, Kirk Tjalas, part owner

13 of Haven, told Relator via text message, "I wanted to let you know I value what you do

14 immensely and could not do what I do without our [sic];" "I need you and so does

15 haven."

16      186.   Not only was Relator successful at growing the company, she was promised

17 merit-based raises for her work.

18      187.   For example, on or about July 9, 2019, Relator sent a text message to Jamin

19 Ruark asking if she would be receiving a raise for her successful work and bringing in

20 additional business. Jamin Ruark responded, "I already told you that you were getting a

21 raise … you will be compensated for the amazing growth you've brought on."

22      188.   Relator never received the entirety of the promised raise, despite her

23 successful performance.

24      189.   Although Relator excelled in her position, the conditions of her

25 employment drastically changed after her reports of fraudulent conduct.

26      **B.    Relator Reported and Refused to Engage in Fraud.**

27      190.   Relator was steadfast in voicing her concerns regarding Haven's

28 misconduct. As described below, Relator's consistent statements to the Ruarks, Tjalas,

1  and her director-level colleagues made her position clear:  billing for services that were

2  never provided or provided only via telehealth was unethical, misleading, and fraudulent.

3      191.    Relator had multiple conversations with Tjalas and the Ruarks informing

4  them that billing the DOL for telehealth visits constituted fraud.

5      192.    Relator explained repeatedly to Tjalas and Jamin Ruark that based on her

6  prior billing experience, there would be a code on point if telehealth visits were

7  permissible.

8      193.    On multiple occasions throughout 2018 and 2019, Relator, often in the

9  presence of her director-level colleagues, told Kirk Tjalas and Jamin Ruark that she was

10  uncomfortable with Haven billing for telehealth visits. However, nothing changed.

11      194.    Instead, Tjalas and the Ruarks attempted to assure Relator that Haven's

12  practice was appropriate. Relator was not convinced.

13      195.    For example, in the spring of 2019, Relator reported fraudulent conduct by

14  Tjalas and Ellyn Hawkins, another Haven employee, to the Ruarks. Both employees had

15  documented patient visits that never occurred.

16      196.    Relator subsequently confronted Hawkins about her conduct and told her

17  that she had reported it to the Ruarks. Hawkins then quickly deleted her "phantom"

18  patient visits from the client's records.

19      197.    Tjalas had a different response; he called both Relator and Hawkins into his

20  office. Relator and Hawkins sat in the chairs in front of his desk. Tjalas, still standing,

21  told Relator and Hawkins he needed trust and loyalty from his employees. He said he did

22  not appreciate Relator's report of his conduct to the Ruarks. He discussed how hard he

23  had worked to build the company and that he did not need anyone messing it up.

24      198.    Then, with eyes locked on Relator, Tjalas suddenly drew a gun from his

25  side and slammed it down on the desktop—the barrel pointed at Relator's chest. With his

26  gun aimed at Relator, Tjalas asked, "Are we all on the same page?"

27      199.    Fearfully, Relator said "yes" and quickly tried to turn the discussion to

28  other business matters, hoping to get out of the situation as quickly as possible. Tjalas

1 then proceeded to sit down in the chair at his desk.

2       200.    When this traumatic meeting finally ended, Relator left, but Hawkins

3 stayed behind to talk alone with Tjalas. In Relator's experience, this was not unusual

4 because Hawkins and Tjalas were close friends. After Relator left, Tjalas deleted all of

5 the falsely documented visits from February 5, 2019, to February 17, 2019, from patient

6 J.S.'s schedule/chart.

7       201.    Relator reported the incident to the Ruarks shortly after it happened.

8       202.    Relator's conditions of employment drastically changed after this report.

9       203.    Relator came into work every day fearing for her health and safety.

10       204.    Tjalas continued to carry his gun in the office even though it is against

11 office policy and even after Relator reported his threatening behavior to the other

12 partners.

13       205.    Relator was so scared, she purchased a recording device to carry with her

14 while at the office. Although the device would not prevent physical harm, it gave Relator

15 some comfort knowing that if something were to happen, it would be recorded.

16       206.    Relator also did her best to limit her time in the office over the next several

17 months, especially if she knew Tjalas was going to be there. She also varied her driving

18 routes to and from work, out of fear that Tjalas or another Haven employee might try to

19 take some action against outside of the office.

20       207.    In April 2019, Relator reported fraudulent conduct internally to Kevin

21 Ruark regarding Tjalas and Ellyn Hawkins' having documented visits for patient J.S.

22 from February 5, 2019, to February 17, 2019, even though no one from Haven made any

23 contact with patient J.S. until February 18, 2019. In her email Relator specifically stated,

24 "if those charges are billed it is fraud."

25       208.    Kevin Ruark responded that he would look into the matter and wanted to

26 discuss it with Tjalas. Given Tjalas' past violent threats after learning about reports of his

27 illegal conduct, Relator asked if the issue could just be left to the appropriate compliance

28 officer. Kevin Ruark responded, "It can … I assume you don't want Kirk to react

negatively … I'll have to confront him about it eventually?"

209. Relator understood Kevin Ruark's response to acknowledge that Tjalas had brandished a gun at Relator.

210. On April 13, 2019, Kevin Ruark informed Relator he had spoken with Tjalas, who had agreed that Haven "should not bill for any services that we did not provide," and told Relator, "so all is well."

211. On or about June 19, 2019, one of Relator's colleagues was unexpectedly terminated. His termination coincided with his disclosure to Relator of fraudulent conduct occurring at the Washington location, which Relator in turn reported to Haven.

212. Tjalas terminated the employee without consulting Relator, despite her supervisory responsibility for the Washington office.

213. Upon learning of the termination, Relator sent Jamin Ruark a text message on June 19, 2019, stating: "We terminate and intimidate employees who do the right thing."

214. Defendants encouraged Relator not to quit after this incident.

215. Dismayed with Haven's reaction to her reports, Relator brought her concerns directly to the DOL. She spoke with LaTrice White, a Senior Claims Examiner at the DOL, who confirmed that seeing patients via telehealth was not permissible and that authorization for in-home care means the care must actually be provided in the home.

216. Relator and White also discussed other issues, such as Haven staff leaving the home with the patient. White informed Relator that the DOL had other programs to take the patient to the doctor, pharmacy, or other locations outside the home and that Haven's staff was to stay in the home with the patient. White told Relator that if Haven staff or the patient left the home for any reason, Haven's billings would be impermissible because the DOL did not authorize services rendered outside the patient's home.

217. Per company policy, Relator recorded this conversation and retained it in her work emails. Relator also sent the recording of that conversation to Tjalas and the Ruarks, as well as to Ellyn Hawkins, Director of Quality Assurance, and Shodi Hornish-

42

Hensley, Administrative Clinical Director.

218.    Armed with renewed confidence that her concerns were valid, on or about August 3, 2019, Relator reported Haven's conduct to the DOL. Specifically, she reported that Tjalas had falsely billed for case management services for patient J.S. from February 18 through April 22, 2019.

219.    On August 13, 2019, after speaking with Jamin Ruark and Shodi Hornish-Hensley, and at Jamin Ruark's request, Relator provided a more detailed report of the fraudulent conduct she had discovered and reported regarding Haven's fraudulent billing for patient J.S.

220.    All was not well. After her report to the DOL, and the related internal reports, Relator's employment conditions again changed. Not only were her duties were slowly eroded away, but Tjalas also continued to threaten her.

221.    On August 15, 2019, just days after her detailed report of Tjalas' misconduct, Tjalas came into Relator's office—just the two of them this time. Tjalas was between Relator and the door. While Relator sat behind her desk, Tjalas casually took a seat and put his feet up on her table. He began talking to Relator about "the thing she did," which Relator understood to reference her report of his fraudulent conduct to the DOL, and informing the Ruarks and Hornish-Hensley about it.

222.    Tjalas again began discussing the need for trust and loyalty, particularly as the company grew. Relator told Tjalas he was making her uncomfortable. Shockingly, and without warning, Tjalas drew a knife and began stabbing boxes that were on Relator's table. He stabbed them over and over.

223.    Relator was frozen behind her desk. Despite Tjalas' sudden violent outburst, she kept her composure and told Tjalas, "what is done is done, I did my job, and it's up to DOL now."

224.    Relator asked that they both attempt to move forward and tried to change the subject. She began to discuss other issues with current patients in hopes that Tjalas would leave. He ultimately did.

225.   On August 20, 2019, Relator told the Ruarks what had happened and provided them with photos of the boxes Tjalas had repeatedly stabbed.

226.   Haven still took no action to protect Relator from the clear pattern of harassing and retaliatory conduct she was experiencing.

227.   On October 15, 2019, Relator again had to attend a meeting with Tjalas. Fearful of what he might do to her, she recorded the meeting. Several topics were discussed. First, Tjalas expressed his continued extreme frustration with Relator for reporting him to the DOL. Second, Tjalas admonished Relator for reporting to the other partners (the Ruarks) that he had threatened her with his gun by slamming it down on the desk and denied that the incident occurred. Lastly, he told Relator that he needs to be able to trust her and she is making a bigger deal of things than they are. Relator responded that she did what she thought was right in reporting his fraudulent conduct. Fortunately, no threats of physical violence occurred during this meeting, but it was clear to Relator she continued to be treated differently because of her reports.

228.   Later that fall, during one of her weekly oversight calls, Relator discovered that a staff member, Roberta Graves, was engaged in fraudulent activity in the Farmington office.

229.   To curb this misconduct, Relator began training staff on avoiding fraudulent billing during her weekly calls to each office she oversaw.

230.   During one such call/training session with the Farmington office in late 2019, Tjalas walked in and reacted angrily, directing staff not to listen to Relator.

231.   After this incident, Tjalas removed most of Relator's responsibilities for the Farmington office.

232.   This proved to be a consistent pattern—whenever Relator found a problem or raised a concern, a responsibility was taken from her. This made it clear to Relator that Haven knew about the illegal conduct and was more interested in silencing her than correcting the fraud.

/ / /

44

233.    In December 2019, Jamin Ruark covertly put Hornish-Hensley in charge of the DOL Division, which was Relator's responsibility. He then called a face-to-face meeting with Hornish-Hensley, Tjalas, Kevin Ruark, and Relator to relay the news and discuss the recent events that had occurred. That meeting was the first time Relator had heard that Ruark was taking away her role as Corporate Administrator for the DOL.

234.    During the meeting, Tjalas said he was extremely upset with Relator and felt betrayed. Following this meeting, Relator was further ostracized by being excluded from any company activities.

235.    In early January, Relator's duties were further stripped away when Haven told her she was no longer in charge of Human Resource Administration and Management.

236.    In mid-January, Relator learned that Hornish-Hensley and Tjalas were making false complaints about her to the Haven board.

237.    Concerned more duties would be lost, Relator agreed to meet privately with Kevin Ruark about these complaints. He inquired how she wanted to move forward. Seeing little hope that the harassing and retaliatory behavior would stop, Relator indicated that she would step back from the Washington office – further limiting the duties and oversight that she once had – and limiting her duties to the Tucson and Silver City offices.

238.    On January 22, 2020, Relator learned that Haven had cut Relator's access to the company's medical record system – in essence preventing Relator from performing even the minimal duties she had left. Relator was told by the colleague that effectuated the change that Tjalas had requested it.

239.    Relator immediately emailed Kevin Ruark about this unexplained change and tried calling Jamin Ruark and Hornish-Hensley several times that day.

240.    A colleague told Relator the alleged reason for removing her access to medical records was "due to [her] dropping Ellyns access." Relator informed Kevin Ruark in her email that she had never done any such thing and that a user access report

1   would verify that.

2       241.   In that same email, Relator told Kevin Ruark that a meeting with Silver

3   City, which until that point was still under her supervision, had been scheduled and that

4   she was being intentionally excluded from it. She asked, "If I am being pushed out please

5   advise."

6       242.   Relator received no responses from Haven—neither by phone nor email.

7       243.   By the evening of January 22, 2020, the culmination of enduring months of

8   harassing and retaliatory behavior, and the daily fear Relator faced of physical harm,

9   finally overwhelmed her.

10      244.   Relator began suffering abdominal complications (including episodes of

11  rectal bleeding). Relator considered going to the hospital, but chose instead to consult her

12  doctor first. Her doctor informed her that the complications were likely due to the

13  overwhelming stress she was suffering and that she should remove herself from that

14  environment.

15      245.   Confronted with the reality that Haven would not cease its illegal activity

16  and would continue its pattern of harassment and retaliation against her for reporting and

17  refusing to engage in fraud, and with confirmation that working in such an environment

18  posed a serious risk to her mental and physical well-being, Relator was left with no

19  choice but to end her employment.

20      246.   In the late evening January 22, 2020, Relator tendered her forced

21  termination to Defendants. She stated, "Due to continued harassment and unfair labor

22  practices I hereby turn in my resignation effective immediately."

23      247.   Relator has been significantly harmed due to the pattern of harassment and

24  retaliation she experienced, including her forced termination, because of her efforts to

25  stop Defendants' violations of the FCA. She is entitled to all relief necessary to make her

26  whole. She has lost back and front pay and suffered emotional distress from the negative

27  treatment she experienced during her employment and as a result of her forced

28  termination.

# VIII.  COUNTS

## COUNT I
### FCA: Presentation of False Claims
### (31 U.S.C. § 3729(a)(1)(A))

248.    Relator realleges and incorporates by reference the allegations in the preceding paragraphs.

249.    This is a claim for treble damages and penalties under the FCA.

250.    Through the acts described above and otherwise, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented to the Government materially false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

251.    The Government was unaware of the falsity or fraudulence of the records, statements, and claims made or presented by Defendants, their agents, and employees.

252.    The false and fraudulent representations and claims Defendants knowingly made to the Government were material to the Government's decisions to make payments to Defendants.

253.    Had the Government actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments to Defendants.

254.    Defendants knew, both in fact and within the meaning of the FCA, that through the acts described above, they would be violating the FCA by getting false or fraudulent claims submitted or caused to be submitted by Defendants allowed or paid by the Government.

255.    Though Relator can identify some of the false claims for payment that Defendants presented or caused to be presented, Relator cannot identify all such false claims because Relator does not have access to all the records in Defendants' possession.

256.    By reason of the Defendants' acts, the Government has been damaged, and continues to be damaged, in a substantial amount yet to be determined.

1    257.    The Government is also entitled to the maximum penalty under 31 U.S.C.

2    § 3729(a)(1)(A) for each and every violation alleged herein.

3                                                **COUNT II**
                      **FCA: Using False Statements to Get False Claims Paid**
4                                          **(31 U.S.C. § 3729(a)(1)(B))**

5    258.    Relator realleges and incorporates by reference the allegations in the

6    preceding paragraphs.

7    259.    Through the acts described above, Defendants, in reckless disregard or

8    deliberate ignorance of the truth or falsity of the information involved, or with actual

9    knowledge of the falsity of the information, made, used, or caused to be made or used

10    false records or statements material to the payment of false or fraudulent claims in

11    violation of 31 U.S.C. § 3729(a)(1)(B).

12    260.    Defendants' false certifications and representations were made for the

13    purpose of ensuring that the Government paid the false or fraudulent claims, which was a

14    reasonable and foreseeable consequence of Defendants' statements and actions.

15    261.    The Government was unaware of the falsity of the records, claims, or

16    statements made or used by Defendants, their agents, and employees.

17    262.    The false and fraudulent representations and claims Defendants knowingly

18    made to the Government were material to the Government's decisions to make payments

19    to Defendants.

20    263.    Had the Government actually known of the false or fraudulent nature of

21    Defendants' representations and claims, it would have been prohibited by law from

22    making corresponding payments to Defendants.

23    264.    Defendants knew, both in fact and within the meaning of the FCA, that

24    through the acts described above, they would be violating the FCA by making or using

25    false statements or records material to false or fraudulent claims submitted by

26    Defendants.

27    265.    By reason of the Defendants' acts, the Government has been damaged, and

28    continues to be damaged, in a substantial amount yet to be determined.

48

1    266.    The Government is also entitled to the maximum penalty under 31 U.S.C. §

2  3729(a)(1)(B) for each and every violation alleged herein.

3                                    **COUNT III**
                **FCA: False Record Material to Obligation to Pay**

4                          **(31 U.S.C. § 3729(a)(1)(G))**

5    267.    Relator realleges and incorporates by reference the allegations in the

6  preceding paragraphs.

7    268.    Through the acts described above, Defendants knowingly made, used, or

8  caused to be made or used false records or statements material to an obligation to pay or

9  transmit money to the Government and knowingly and improperly concealed, avoided, or

10  decreased an obligation to pay or transmit money to the Government in violation of 31

11  U.S.C. § 3729(a)(1)(G).

12    269.    The Government was unaware of the falsity of the records, statements, and

13  claims made or submitted by Defendants.

14    270.    The false and fraudulent representations and claims Defendants knowingly

15  made to the Government were material to the Government's decisions to make payments

16  to Defendants and deprived the Government of money Defendants were obligated to pay

17  to the Government.

18    271.    Defendants knew, both in fact and within the meaning of the FCA, that

19  through the acts described above, they would be violating the FCA by making or using

20  false statement or records material to conceal, avoid, or decrease an obligation to pay or

21  transmit money or property to the Government.

22    272.    By reason of the Defendants' acts, the Government has been damaged, and

23  continues to be damaged, in a substantial amount yet to be determined.

24    273.    The Government is also entitled to the maximum penalty under 31 U.S.C. §

25  3729(a)(1)(G) for each and every violation alleged herein.

26  / / /

27  / / /

28  / / /

1

2

**COUNT IV**
**Retaliation in Violation of the FCA**
**31 U.S.C. § 3730(h)**

3    274.    Relator realleges and incorporates by reference the allegations in the

4    preceding paragraphs.

5    275.    Relator was unlawfully threatened, harassed, disciplined, and discharged by

6    Defendant in retaliation for lawful acts done by her on behalf of the United States and the

7    general public in furtherance of an action under the FCA, as well as her efforts to stop

8    one or more violations of the FCA. Defendants violated 31 U.S.C. § 3730(h)(1) when

9    they retaliated against Relator for exercising her rights and engaging in protected action

10    under the FCA.

11    276.    As a direct result of Defendant's unlawful retaliatory conduct, Relator has

12    experienced damages for which she is entitled to relief under 31 U.S.C. § 3730(h)(2).

13

14

**COUNT V**
**Retaliation in Violation of**
**Ariz. Rev. Stat. Ann. § 23-1501**

15    277.    Relator realleges and incorporates by reference the allegations in the

16    preceding paragraphs.

17    278.    Relator was unlawfully harassed and retaliated against, forcing her

18    termination, because she reported and refused to engage in conduct that violated federal

19    and state law. First, Defendants unlawfully harassed and retaliated against Relator,

20    forcing her termination, for refusing to violate federal law (which is the supreme law in

21    Arizona) and Arizona laws against fraud in violation of Ariz. Rev. Stat. Ann. § 23-

22    1501(3)(c)(i). Secondly, Defendants unlawfully harassed and retaliated against Relator,

23    forcing her termination, for reporting in a reasonable manner conduct by Defendants that

24    Relator reasonably believed to be a violation of Arizona law (including laws against

25    fraud) in violation of Ariz. Rev. Stat. Ann. § 23-1501(3)(c)(ii).

26    279.    As a direct result of Defendants' unlawful retaliatory conduct, Relator has

27    experienced damages for which she is entitled to relief under Ariz. Rev. Stat. Ann. § 23-

28    1501.

50

**COUNT VI**
**Retaliation in Violation of**
**Public Policy**

280.    Relator realleges and incorporates by reference the allegations in the preceding paragraphs.

281.    Relator was unlawfully threatened, harassed, retaliated against and discharged because she reported, both orally and in writing to her employer, and refused to engage in, violations or suspected violations of state and federal law and regulations, including, but not limited to, those laws that prevent fraud generally and fraud against the Government. Accordingly, to the extent not covered by Ariz. Rev. Stat. Ann. § 23-1501, Defendants' unlawful threats, harassment, discipline, and discharge violated public policy.

282.    As a direct result of Defendants' unlawful retaliatory conduct, Relator has experienced damages for which she is entitled to relief.

## IX.    PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.    <u>On Counts I, II, and III</u>:

1.    that Defendants cease and desist from violating 31 U.S.C. §§ 3729, *et seq.*;

2.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Government has sustained because of Defendants' actions, plus a civil penalty for each violation of 31 U.S.C. § 3729, as provided in 31 U.S.C. § 3729 and adjusted for inflation, 28 C.F.R. § 85; and

3.    that Relator be awarded the maximum amounts allowed pursuant to 31 U.S.C. § 3730(d).

B.    <u>On Counts IV, V, and VI</u>:

1.    that this Court enter judgment for Relator and against Defendants with respect to her federal and state retaliation claims;

/ / /

2.      that Relator be awarded two times the amount of any back pay that she would have had but for the retaliation, and interest on the back pay;

3.      that Relator be awarded reinstatement or front pay in an amount to be determined at trial; and

4.      that Relator be awarded compensation for all special damages, including emotional distress, sustained as a result of the retaliation, in an amount to be determined at trial.

C.      On All Counts:

1.      that Relator be awarded all costs of this action, including attorneys' fees and expenses;

2.      that Relator be awarded interest on money judgments, as provided by law; and

3.      that the Government and Relator recover such other relief as the Court deems just and proper.

**X.      REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Dated May 11th, 2020

Lon R. Leavitt
HALUNEN LAW PLLC
Arizona Bar No. 035825
2155 West Pinnacle Peak Road, Suite 201
Phoenix, Arizona 85027
Telephone: (602) 535-2203
Fax: (612) 605-4099
leavitt@halunenlaw.com

Amy L. Easton*
PHILLIPS & COHEN LLP
D.C. Bar No. 463710
2000 Massachusetts Avenue NW
Washington, D.C. 20036
Telephone: (202) 833-4567
aeaston@phillipsandcohen.com

Jeffrey W. Dickstein*
PHILLIPS & COHEN LLP
Florida Bar No. 434829
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1600
Miami, Florida 33131
Telephone: (305) 372-5200
jdickstein@phillipsandcohen.com

*Attorneys for Plaintiff/Relator*

(* *pro hac vice* applications to be filed)